STATE OF OREGON, By and Through the DIVISION OF STATE LANDS, Plaintiff,

v.

The BUREAU OF LAND MANAGE-MENT, DEPARTMENT OF THE INTERIOR, UNITED STATES, Defendant.

Civ. No. 85–646 LE.

United States District Court, D. Oregon.

July 9, 1987.

Dave Frohnmayer, Atty. Gen., Robert W. Muir, Asst. Atty. Gen., Dept. of Justice, Salem, Or., for plaintiff.

Charles H. Turner, U.S. Atty., D. Or., Thomas C. Lee, Asst. U.S. Atty., Portland, Or., for defendant.

## OPINION

LEAVY, Circuit Judge, Sitting by Designation.

The State of Oregon brought this action for judicial review of two decisions of the Interior Board of Land Appeals (IBLA) under 5 U.S.C. § 701 *et seq.* Pending review, both the State and the defendant, the Department of the Interior, Bureau of Land Management, move for summary judgment.

In 1968, the State made four applications to the Oregon State Office of the Bureau of Land Management (BLM) to obtain federal land. The State believed it was entitled to the land under the Admission Act, 11 Stat. 383, an agreement reached with the United States when Oregon was first admitted to the Union. That agreement granted to the State two of the thirty-six sections in every township of public land within Oregon for the use of its schools.

On April 12, 1973, the BLM denied the State's applications. It did so on the basis of an audit of all school land transactions which had taken place between the State and the federal government since Oregon became a state in 1859. On the basis of this audit, the BLM concluded that Oregon had received public lands for school support in excess of its entitlement.

The State appealed the BLM's decision to the IBLA. The IBLA issued two decisions, 78 IBLA 255 (Jan. 10, 1984) and 80 IBLA 354 (May 10, 1984), which determined Oregon's rights to select additional land. The IBLA, while ruling in the State's favor in some issues, upheld the BLM's conclusion that Oregon had received public land in

excess of its entitlement, and therefore was not entitled to select more land.

In its motion for summary judgment, the State assigns as error the IBLA's conclusion that the BLM has authority to conduct an audit of past land transactions in order to determine the State's present right to select land. The State also contends the IBLA erred in deciding the United States, rather than Oregon, had title to certain lands which Oregon used as base to exchange for other federal land between 1929 and 1932. Finally, the State claims the IBLA erred in deciding the State could not receive indemnification for actual acreage in school land sections defined by protractions of unsurveyed federal land.

### FACTS

In 1859, when Oregon was admitted into the Union, the United States agreed to provide certain federal land to Oregon for the support of its schools. The Admission Act, 11 Stat. 383, provides in relevant part:

"That the following propositions be and the same are hereby offered to the said people of Oregon for their free acceptance or rejection, which, if accepted, shall be obligatory on the United States and upon the said State of Oregon, to-wit: First, that sections numbered 16 and 36 in every township of public lands in said state, and where either of said sections, or any part thereof, has been sold or otherwise disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to said state for the use of schools." 11 Stat. 383 § 4.

However, a problem arose when the sections designated for the State were unavailable because the federal government already had disposed of them. To indemnify the State for those losses, Congress enacted several statutes providing for the selection of other public lands in lieu of the unavailable sections. Some of these statutes were consolidated and codified in 1874, revised in 1891, later amended, and are now codified in 43 U.S.C. §§ 851 and 852.

Another statute, the Forest Lieu Exchange Act (Forest Lieu Act) of June 4, 1897, Ch 2, 30 Stat. 11, 36 provided for indemnity selections when sections 16 and/or 36 were located within a national forest.

"That in cases in which a tract covered by an unperfected bona fide claim or by a patent is included within the limits of a public forest reservation, the settler or owner thereof may, if he desires to do so, relinquish the tract to the Government, and may select in lieu thereof a tract of vacant land open to settlement not exceeding in area the tract covered by his claim or patent."

In 1905, the Forest Lieu Act was repealed because of a scheme, known as the Hyde Fraud Combine (HFC), to obtain illegally public land in California and Oregon for speculative purposes. Between 1898 and 1902, one F.A. Hyde and others conspired to obtain State school lands within the boundaries of national forests and to exchange them for more valuable federal land, using the indemnity selection process provided by the Forest Lieu Act. The State held title to these school lands (the "base" lands) within the national forests. Hyde arranged for applicants, some of whom were apparently fictitious, to purchase the base lands from the State. Under Hill's Code § 3618, Oregon citizens could purchase Oregon land, but were limited to 320 acres for personal use, but not for speculation. By affidavit, the citizen represented to the state that he had no contract to sell or dispose of the land. Hyde's elaborate scheme avoided these limitations. Ultimately, the HFC defrauded the State of Oregon of about 47,000 acres of its school lands, and the federal government issued patents to the HFC for approximately 27,000 acres of indemnity lands subsequently selected by the HFC. The school lands cost Hyde $1.25 per acre. Selection rights to the indemnity lands were then sold for a considerable profit. *State v. Hyde*, 88 Or. 1, 32, 169 P. 757 (1918). The HFC persuaded employees of the General Land Office (GLO) in Washington, D.C. to expedite HFC applications for indemnity land in violation of a policy requiring them to be processed in the order received. *Id.*

When the Secretary of the Interior became aware of the fraud in November, 1902, he ordered all applications suspended for forest lieu selections bearing Hyde's name as the applicant or as the attorney for the applicant. Later, the Secretary suspended all applications bearing names of individuals thought to be involved in the HFC. The Department also tried to cancel all patents issued to the HFC for indemnity land, but a statute of limitations prevented cancellation of all but patents to 1,680 acres. On January 1, 1904, the Department suspended all applications for forest lieu selections in which Oregon school lands had been offered as base.

In February 1904, a federal grand jury in Washington, D.C. indicted Hyde and others with conspiracy to defraud the United States of its land. In 1908, Hyde was found guilty of criminal fraud. His conviction was affirmed by the U.S. Supreme Court. *Hyde and Schneider v. United States*, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912).

In 1910, the United States commenced adverse proceedings against Hyde's selections of federal land, based upon fraudulent acquisition of title to Oregon base lands used in the exchange. In 1912, this action was suspended so that Oregon could proceed to cancel the deeds to the base lands. In 1918, the Oregon Supreme Court decided the state's lawsuits against Hyde. *State v. Hyde*, 88 Or. 1, 169 P. 757 (1918); *State v. Hyde*, 88 Or. 61, 169 P. 774 (1918); *State v. Hyde*, 88 Or. 66, 169 P. 775 (1918); *State v. Hyde*, 88 Or. 73, 169 P. 777 (1918); and *State v. Hyde*, 88 Or. 81, 169 P. 779 (1918). Its decisions, discussed later in this opinion, resulted in the cancellation of some, but not all, of the deeds the State issued to Hyde for its base lands.

Several issues in this action stem directly from the fraudulent activity of the HFC in the early years of this century. The BLM and the State contest which of them held title to certain base lands the State deeded to the HFC, which in turn deeded them to the United States in the process of applying for indemnity lands with the GLO. La-

ter, the State acted as titleholder to these base lands when it exchanged them for indemnity land between 1929 and 1932. The BLM audit determined the State's use of these base lands was invalid, because the United States, not the State, properly held title at that time. Now, the State claims it held equitable, if not legal, title to the base lands because it was defrauded by the HFC.

The January 10, 1984 decision of the IBLA, 78 IBLA 255, determined who held title to base lands involved in the HFC's fraudulent scheme and later offered in exchanges in 1929–32. The IBLA issued a second opinion, 80 IBLA 354, on May 10, 1984 deciding another issue: how much idemnity land is Oregon entitled to select when new surveys or protractions reveal the existence of new fractional townships? The State assigns as error the IBLA's determination that it is not entitled to indemnity for the actual acreage in sections in a new fractional township which was determined by protraction, or the projection of cadastral survey lines over unsurveyed areas. The IBLA held instead that the State must use the pro rata rule specified by statute to determine the acreage it is entitled to as indemnity for sections within a fractional township.

■ The issues to be decided are complex in that transactions which occurred around the turn of the century and in the early 1930s must be examined. In its request to bar this litigation with doctrines of repose the Government states; "The decision of this case on its merits will compel the Court to become a judicial archaeologist, unearthing the 'bones of the past' to reconstruct transactions better left to history."[1] Nonetheless, this task is not insurmountable, and I decline the Government's request to impose the doctrines of repose against the State with respect to this litigation.

## SUMMARY JUDGMENT; STANDARD OF REVIEW

The parties agree there is no genuine issue of material fact, so this case may be

---

1. My law clerk, Julia Follansbee, holds a M.A. in archaeology from the University of Oregon.

disposed of by summary judgment. Fed.R. Civ.P. 56(c). Plaintiff's Memorandum in Opposition to Defendant's Second Motion for Summary Judgment, p. 2.

█ The parties also agree the standard of review is whether the decisions of the IBLA are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A). Reply Memorandum of Law in Support of Plaintiff's Motion For Summary Judgment, p. 3. In reviewing these decisions, I grant substantial deference to the statutory interpretations of the Department of the Interior, the agency charged their administration. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Kidd v. United States Department of Interior, Bureau of Land Management,* 756 F.2d 1410, 1412 (9th Cir.1985).

### A. THE OREGON I DECISION: FOREST LIEU SELECTIONS

### THE AUTHORITY OF THE BLM TO AUDIT SCHOOL LAND TRANSACTIONS

In its first assignment of error, the State of Oregon claims the IBLA erred in basing its decison on the BLM audit. The State claims the BLM has no authority to deny its four applications for indemnity land on the basis of an audit of all previous indemnity transactions. Instead, the State contends the BLM may determine only whether its applications meet the criteria of the Admission Act, 43 U.S.C. §§ 851 and 852, and 43 C.F.R. §§ 2621.0–2 to 2621.4. The State argues that none of these statutes or regulations provides for a final adjustment of a state's entitlement to indemnity lands. Therefore, an audit cannot be used to deny an otherwise valid application.

█ As stated previously, the interpretation of a statute by the agency charged with its administration is granted substantial deference. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Kidd v. United States Department of Interior, Bureau of Land Management,* 756 F.2d 1410, 1412 (9th Cir.1985). If the statute is silent, as it is here, with respect to the issue in question, the court

may not substitute its construction in place of the agency's reasonable interpretation. *Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Deference requires affirmance of any interpretation within the range of reasonable meanings the words permit, in accordance with the statute's clear purpose. *Alcarez v. Block,* 746 F.2d 593, 606 (9th Cir.1984).

█ I find the BLM has the authority to conduct an audit and to base its denial of the State's applications upon that audit. The record shows the BLM has interpreted the statutes to permit an accounting of federal land and disbursement of that land. BLM Audit, Part 1, pp 7–8. The Admission Act and 43 U.S.C. §§ 851 and 852 imply there shall be a limited and ascertainable amount of land for school use. The Admission Act provides the State shall be offered "sections numbered sixteen and thirty-six in every township [and if they are unavailable] other lands equivalent thereto...." By definition, a section presumptively contains 640 acres, so the Admission Act at least sets a general rule of 1280 acres in each township for school use. 43 U.S.C. § 851, which describes the situations in which the State may apply for land in lieu of those sections designated, provides "other lands of equal acreage are hereby appropriated and granted, and may be selected...." 43 U.S.C. § 852(b) provides a pro rata rule granting a section or a specific portion of a section for selections of indemnity land when townships are fractional. The words in these statutes describing generally ascertainable acreage demonstrate Congress's intent to place limits on the amount of land granted for school use. I find the BLM's interpretation of these statutes reasonable and therefore I defer to it.

Further, an audit of all transactions is the only practical method by which the BLM can determine whether the grant of land has been exceeded. The State agrees the statutes grant land quantities in principle that are one-eighteenth the total land area of the State, although it maintains the actual ratio is somewhat greater. Plain-

tiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, p. 15, footnote 3. Nonetheless, the amounts are ascertainable, and the State should not be able to obtain more acreage than that ascertainable amount. The statutes cannot be construed so liberally as to defeat the intent of Congress. *See Johanson v. Washington*, 190 U.S. 179, 184, 23 S.Ct. 825, 826, 47 L.Ed. 1008 (1903).

### Estoppel

■ The State argues even if the statutes authorize an audit, its use is inequitable and should be estopped, because the BLM is raising for the first time legal and equitable issues which the GLO adjudicated in the State's favor over fifty years ago, based on Hyde transactions occurring over eighty years ago. It claims the records are hard to locate, fragmentary, and that the BLM has made no showing the record is complete.

I decline to estop the BLM's use of the audit for these reasons. The records are in the custody and control of the Department of the Interior and the BLM. Presumably, they are accessible to the State. No facts are presented to show the records are so fragmentary that the results of the audit may be erroneous and prejudicial to the State. An examination of the exhibits prepared in conjunction with the audit (Exhibit T, Parts 1–5) shows that the BLM had access to specific and detailed information. I cannot conclude that the passage of time alone will preclude the presence of sufficiently accurate information upon which to base an audit.

### TITLE TO BASE LANDS IN THE 1929–1932 EXCHANGES

The State assigns as error the IBLA's holding that Oregon did not have title to certain base lands it exchanged for indemnity land between 1929 and 1932. The BLM audit showed 9,385.17 acres were improperly offered by Oregon because the United States, not Oregon, held title. Agreeing with the BLM, the IBLA concluded the GLO's acceptance of master deeds relinquishing base land vested title in the United States even before patents were issued to the applicant for selected parcels. 78 IBLA 285. The IBLA also concluded even if the GLO improperly accepted the applications for indemnity lands, title to the base land still vested in the United States. 78 IBLA 292. Further, the IBLA held the Oregon Supreme Court's classification of base land in *State v. Hyde*, 88 Or. 1, 54–55, 169 P. 757 (1918) was erroneous, 78 IBLA 293–94, and not binding on the United States, who was a necessary but non-participating party in the State's proceedings against Hyde.

As a result of its conclusions, the IBLA held the State had overdrawn its entitlement to school land under the Admission Act, and that the BLM's rejection of its applications for more land in 1968 was proper. The State was required to substitute valid unused base for further selections of school land, if possible. 78 IBLA 295.

The State argues no title to base lands could vest in the United States until exchanges under the Forest Lieu Act were completed; that is, until patents were issued for selected lands. It claims it holds equitable title to base lands the HFC obtained by fraud and therefore, it used valid base lands in the 1929–32 exchanges. The State also claims the IBLA erred in making certain presumptions in its decision which placed an unfair burden on the State upon remand to the BLM for findings consistent with the IBLA's decision. To understand the arguments the State presents, it is necessary to review how lands involved in the Hyde Fraud Combine were analyzed by the Oregon Supreme Court and the IBLA.

### THE OREGON SUPREME COURT'S AND THE IBLA'S CLASSIFICATIONS OF BASE LAND

To determine which deeds should be cancelled in the State's proceedings against Hyde in 1918, the Oregon Supreme Court divided the base lands into three categories. Supplement A consisted of lands offered as base for lieu selections and accepted. Supplement B consisted of lands offered as base for lieu selections but not accepted. Supplement C consisted of lands

never offered as base for lieu selections. *State v. Hyde*, 88 Or. at 54–55, 169 P. 757. The Court cancelled the State's deeds to the Supplement B and C lands. It did not cancel the deeds to the Supplement A lands. Instead, it dismissed the lawsuit as to those lands because it found the United States was a necessary party who had refused to join the proceedings. *Id.* at 22–23.

 In the years which followed, Hyde quitclaimed back to Oregon some of the lands he acquired. Included were 2600 acres of Supplement B and C lands for which no exchanges were completed, and 1800 acres of Supplement A lands. The GLO cancelled selections involving the Supplement B lands, informing applicants that these base lands were the property of Oregon. In 1929 through 1932, the GLO approved, under the Presidential Proclamation of April 28, 1927, clear lists of federal lands transferred to Oregon by agreement with the government to satisfy unmet indemnity selections under the Forest Lieu Act. A clear list is a government list of lands, title to which has been cleared to a party. It transfers title as effectively as a patent. *U.S. v. Sourthern Pacific Transportation Co.*, 601 F.2d 1059, 1061–62 (9th Cir.1979).

In all, 11,385.17 acres were offered as base in the 1929–32 exchanges. Eighteen hundred acres were Supplement A land Hyde had quitclaimed back to Oregon. The rest, 9,385.17 acres, were thought to have been properly classified as Supplement B and C lands by the Oregon Supreme Court.

The IBLA divided the Supplement A, B and C lands into two categories, I and II. Category I contained all A, B and C lands for which indemnity lands were received in the 1929–32 exchanges. The BLM contended before the IBLA that the United States held title to all 11,385.17 acres of Category I offered as base in the 1929–32 exchanges. However, the IBLA held that 1800 acres of Supplement A lands were valid base, because the State was subrogated to Hyde's right to select by virtue of his quitclaims of this acreage back to the State. The re-

maining 9,385.17 acres are discussed later in the opinion.

Category II consists of land for which the State has received no indemnity. It contains 2,662.42 acres. These lands were not involved in the 1929–32 exchanges. The 1342.62 acres are Supplement A lands to which the deeds to Hyde were not cancelled in *State v. Hyde*. Six hundred eighty acres are Supplement B and C lands. Another 640 acres were not considered in *State v. Hyde*. The State contends the Category II lands are valid unused base which the BLM has refused to recognize.

## ANALYSIS

1. *Requirement That Oregon Prove Its Deeds Were Issued to Fictitious Persons*

 To decide who held valid title to the base lands in the 1929–32 exchanges, the IBLA reviewed case law to determine how Hyde's scheme worked. Knowing that Hyde fraudulently obtained deeds of base land from the State, the IBLA needed to determine which deeds were void and which were voidable. It correctly cited *Moffat v. United States*, 112 U.S. 24, 5 S.Ct. 10, 28 L.Ed. 623 (1884) for the rule that a deed made out to a fictitious person is void, while a deed to a real person, even if obtained by fraud, is voidable by proper legal action. *Hyde v. Shine*, 199 U.S. 62, 25 S.Ct. 760, 50 L.Ed. 90 (1905) alluded to the fact that some deeds were issued to fictitious parties:

> The conspiracy charged embraced certain false practices by the defendants, whereby school lands were to be obtained fraudulently from the States of California and Oregon by Hyde and Benson, (1) in the names of fictitious persons, and (2) in the names of persons not qualified to purchase the same, whereby the said Hyde and Benson were to cause and require such school lands to be relinquished by means of false and forged relinquishments, assignments, and conveyances to the United States, in exchange for public lands to be selected, and for titles thereto by patents to be obtained by and on behalf of the said

Hyde and Benson. *Hyde v. Shine*, 199 U.S. at 78, 25 S.Ct. at 762.

However, the State challenges the IBLA's conclusion that "We think it clear that the great bulk of the fraud perpetrated by the Hyde Fraud Combine involved [real people] rather than fictitious persons." 78 IBLA 275. Calling this a "presumption," the State claims the IBLA then placed a burden of proof on it in violation of Federal Rule of Evidence 301. On remand, the IBLA required the State to prove which applicants were fictitious in order to void those deeds, so that the BLM could revise its audit accordingly. The State was unable to show any applicants were fictitious.

The IBLA did not create a presumption. It based its findings on the facts provided to the Oregon Supreme Court in *State v. Hyde*, 88 Or. 1, 30, 169 P. 757, 766–67. There, the facts show Hyde, through one Schneider, contacted certain business people and their employees, and anyone else who would participate, in order to obtain dummy applicants to purchase the State's school lands. The people who agreed to participate assigned their rights to the HFC for a nominal fee. People who participated testified at the trial. Hyde provided Schneider with letters of introduction. There is no evidence of fictitious people used in Oregon in the proceeding most likely to have taken them into account. Given this factual evidence describing Hyde's scheme in Oregon, the IBLA's conclusion was reasonable that most of the dummy applicants in Oregon were real people. Accordingly, it was reasonable to instruct the State upon remand to show which individuals were fictitious. The State, through its historical records and access to county archives, is in the better position to determine which, if any, of the applicants were fictitious.

### 2. The Vesting of Title to the Base Lands in the United States

#### a. Facts

The Forest Lieu Act of 1897 did not describe the procedures by which a holder of land within a forest reserve could obtain land outside in exchange. The Land Department of the General Land Office had to adopt rules and regulations for the administration of the Act. The rules are found in 24 L.D. 592–93. The United States Supreme Court has described them as reasonable and valid. *Cosmos Co. v. Gray Eagle*, 190 U.S. 301, 309, 23 S.Ct. 692, 696, 47 L.Ed. 1064 (1902).

The rules outlined these procedures in paragraphs 15, 16 and 17: (1) prepare a quitclaim deed relinquishing base land to the United States, along with an affidavit of title to show the deeds were effective to pass title and that the lands were free of tax liens or other encumbrances; (2) file the deed and the abstract with the local land office; and (3) file with the deed and the abstract an application form for the selected lands.

The State argues that title to the base lands did not vest in the United States until the entire exchange was completed. Therefore, no title could vest unless the GLO issued a patent to the selected lands to verify their acceptance of the base lands and approval of the applicant's selected lands. Based upon Oregon law, the State also argues that no title is conveyed unless the grantor intended to deliver title, *Telschow v. Quiggle*, 74 Or. 105, 109, 145 P. 11 (1914), and that the delivery must be unconditional, *Lancaster v. May*, 194 Or. 647, 654, 243 P.2d 268 (1952). The State maintains a proper inference is that Hyde did not intend to convey title to his base lands to the United States unless and until his selections of indemnity land were approved and patented to him. Therefore, the intent to deliver was conditioned on receipt of patents to selected lands. Because the United States did not meet that condition, it could not acquire title to Hyde's lands. Plaintiff's Memorandum in Opposition to Defendant's Second Motion for Summary Judgment, p. 22. The State also cites *Roughton v. Knight*, 219 U.S. 537, 31 S.Ct. 297, 55 L.Ed. 326 (1911) and *Udall v. Battle Mountain Co.*, 385 F.2d 90, 94 (9th Cir.1967), to support its claim that both acceptance of the base lands and approval

of the selection must occur before the United States obtained title to base land.

### b. *The IBLA Holding*

■ Following the decision of the Oregon Supreme Court in *State v. Hyde*, 88 Or. at 16, 169 P. 757, the IBLA held the United States obtained title to the base lands upon GLO acceptance of the deed relinquishing those base lands, before the applicant received a patent to the selected lands. 78 IBLA 285.

I find the IBLA's holding was not arbitrary, capricious, or otherwise contrary to law. The major cases the State cites do not support its position, and even assuming state law applies to the question of delivery, the deeds to the GLO show the grantor's intent. The Forest Lieu Act of 1897 has been construed as an offer of exchange. *Roughton v. Knight*, 219 U.S. at 546, 31 S.Ct. at 298. If that offer was accepted, a contract was created whereby an applicant had a right to select and receive land in exchange. If the Government did not uphold its part of the bargain, the applicant could sue for recission or specific performance.

Therefore, it is not inequitable, as the State contends, for the United States to acquire title to the base land before the exchange was completed.

*Roughton v. Knight*, 219 U.S. 537, 31 S.Ct. 297, does not contradict this conclusion:

> To take advantage of the proposal contained in this act, the applicant must select the land he wishes to receive in lieu, and file a sufficient relinquishment of land within a forest reserve. Manifestly there must be an acceptance of the relinquishment by someone authorized to decide upon its sufficiency, and an assent to the particular selection made in lieu. 219 U.S. at 547, 31 S.Ct. at 299.

This paragraph, cited by the State in support of its position, does not decide when title to base land vests in the United States. The purpose of the paragraph is only to describe how an applicant takes advantage of the Act.

A Ninth Circuit decision also does not contradict this interpretation:

> Since the relinquishment to the United States contemplated a completed exchange of lands an equity in the nature of a right to recission remained with the owner of the relinquished land until the exchange had been completed and it was not until then that the United States might be regarded as vested with unconditional ownership. It was reasonable under these circumstances to regard the selection right as appurtenant to the owner's equity. *Udall v. Battle Mountain Co.*, 385 F.2d 90, 94 (9th Cir.1967).

*See* Exhibit D, Defendant's Second Motion for Summary Judgment, pp. 2–3 (Sisk Act–Petition for Rulemaking, Memorandum from the Department of the Solicitor, U.S. D.I., April 18, 1986).

Finally, by quitclaim deed, Hyde agreed to unconditionally surrender the base land and thereafter to select indemnity land:

> That Whereas, I, the undersigned, am the owner of the land hereinafter described included within the limits of the Cascade Range Forest Reservation in the State of Oregon, which land I desire to relinquish to the United States and select in lieu thereof an equal quantity of vacant land open to settlements, provided by the Act of Congress of June 2, 1897: (30 Stat. 36).
>
> Now, Therefore, do hereby release, remise, grant and relinquish to the United States of America, the said land which is described as follows and containing 2880 acres, and I agree to accept in lieu thereof other land to be hereafter selected by me or my assigns equal in area to that herein relinquished.
>
> Deed from F.A. Hyde and F.T. Hyde to the United States, June 14, 1899.

Under these circumstances, I cannot find the State holds any equitable title to the base land it sold to Hyde.

### 3. *The 1978 Audit and the Reclassification of Supplement B and C Lands*

■ In a 1978 audit of all previous school land exchanges under the Forest Lieu Act of 1897 between the State of

Oregon and the federal government, the BLM discovered the Oregon Supreme Court erroneously classified 9,395.17 acres of Supplement A land as B and C land in Category I. If so, the United States owned far more acres than previously thought in the land exchanges of 1929–32, making the State's offer of these base lands invalid since the State did not own them.

This discovery occurred when the BLM found that the GLO issued patents for selected lands in exchange for some, but not all, of the base lands offered in deeds to the United States. In other words, nonequivalent amounts of base and selected lands were exchanged. The Oregon Supreme Court apparently classified as A land only those base parcels in exchange for which selected land was patented, even if the deed contained additional base land.

The BLM argued the GLO approved the entire deed of base land even though it may have issued patents on less than an equivalent amount of selected land. Its basis for this conclusion is that the GLO could not have accepted only part of a deed. The IBLA found "compelling logic" in this argument. 78 IBLA 293–94. On remand, the IBLA required the BLM to inform the State of the record proof of acceptance of such "master deeds." The State was required to show either: 1) that a portion of the deed was not accepted with respect to base lands it listed for exchange, or 2) that prior to the 1929–32 exchanges, the State acquired the selection rights appurtenant to the reclassified Supplement A lands. The IBLA required these showings only for the B and C lands in Category I, for which indemnity land was received in the 1929–32 exchanges. To the extent the State was unable to make either of these showings, the IBLA ruled the base previously tendered would be deemed improper, and valid unused school base would have to be substituted. 78 IBLA 295.

After remand, the BLM identified 6,901.-17 acres on master deeds which were accepted by the GLO. The State could not show any portions of these deeds were unaccepted, or that they had acquired subrogation rights from HFC selectors.

The State objects to the IBLA "presumption" that the GLO in fact approved entire deeds before issuing patents for nonequivalent amounts of selected land. It further objects to the requirement that the State must produce evidence that only part of these deeds were approved, or that it acquired subrogation rights, for the reason that the BLM has custody and control of such records. Oregon contends the IBLA's conclusion is arbitrary and capricious because it is contrary to its own finding that the GLO never exercised its judicial function to approve of Supplement B and C lands, 78 IBLA 293, and to the Stipulation of the Parties that no GLO approval issued with respect to these lands. Stip. at 43, 59. The State argues the IBLA's conclusion that the GLO "must have" followed the law in approving a master deed is another unwarranted presumption, because GLO employees were terminated for taking payments to further the HFC scheme. Finally, the State argues that GLO approval required assent to the *particular* selection made in lieu. *Roughton v. Knight,* 219 U.S. at 547, 31 S.Ct. at 299.

I find the IBLA's conclusion was not arbitrary or capricious. The record supports that such deeds were accepted. The basis for the BLM's and the IBLA's conclusion is plainly the record proof that the 6,901.07 acres had been included in deeds from Hyde, with other lands in the same applications for which forest lieu selection patents had been issued by GLO. 1978 Audit, Part 4 at 164–67, 168. Other facts in the record demonstrate why such transactions occurred. Apparently, it was a common practice for applicants to make only a partial selection of land desired in exchange for relinquishment of their base land. A departmental instruction dated March 6, 1900, 29 L.S. 578 states:

> (Y)our office has been accepting relinquishments under said Act (Act of 1897) which are accompanied by a selection of other lands equivalent in area to only a portion of the lands relinquished, and recognizing the right of the one making the relinquishment to select at some subsequent time or times at his pleasure

such quantity of land as will make that selection equal to that relinquished.

The Secretary then directed the department to change its procedure and notify applicants that a practice of partial selection with total relinquishment of base lands was risky.

 The related arguments of the State are without merit. The IBLA reasonably required the State to prove GLO's acceptance of portions of the master deeds or that it acquired subrogation rights via quitclaims from Hyde. The State did not show the BLM prevented access to necessary records. Findings and stipulations regarding Supplement B and C lands cannot pertain to lands properly classified as Supplement A land. Case law describes the GLO employees' wrongdoing as taking the HFC applications out of the order in which they were received, contrary to policy, and promising to notify HFC members if any investigation commenced. *Hyde v. Shine,* 199 U.S. 62, 79, 25 S.Ct. 760, 762, 50 L.Ed. 90 (1905). Without evidence, it is speculation to assume GLO employees acted contrary to policy in their acceptance of deeds. Finally, assent to particular indemnity parcels does not mean that GLO did not accept entire deeds of base land. *Roughton v. Knight* does not support the State's position that only parts of deeds could be properly accepted.

4. *Estoppel Against the BLM's Determination That Base Land Was Invalid in 1929–32 Exchanges*

The State argues the BLM lacks authority to question the actions of its predecessor, the GLO. Specifically, the State objects to the BLM's determination in its 1978 audit that the State's base was invalid in the 1929–32 exchanges, because the GLO had clear listed the parcels selected to the State and represented to applicants that the Supplement B lands belonged to the State. The State contends the BLM should be estopped from denying the validity of the base for these exchanges based on the actions of the GLO, because the BLM waited over forty years to question its status.

 The Ninth Circuit has held that in order to equitably estop the government, the government's affirmative misconduct must be shown. Affirmative misconduct consists of an affirmative misrepresentation or the affirmative concealment of a material fact. *United States v. Ruby,* 588 F.2d 697, 703–04 (1978). Even if the elements of estoppel are present,[2] and affirmative misconduct is shown, when title to public lands is involved, policy consideration demand that estoppel not be applied without compelling reasons. *United States v. Ruby,* 588 F.2d at 704.

 I find that estoppel will not preclude the BLM's determination that the base in the 1929–32 exchanges was invalid. The first element of estoppel is not met in that the GLO did not know the true status of the base land offered in these exchanges. It acted on the State's highest legal authority that the Supplement B base lands belonged to the State. No one questioned whether these lands were classified properly at that time.

Further, even if all the elements of estoppel against the government are met, no compelling reason exists to apply estoppel. The State was benefitted in these transactions. It is not required to return that benefit to the United States. Rather, it must account for invalid base in the process of selection now, so that it does not receive more than the ascertainable amount of land Congress intended it to receive under the Admission Act.

The reasons the IBLA estopped BLM from asserting its title to the 1800 acres of Supplement A land do not apply to the reclassified 6,901.17 acres, as the State contends. *See* 78 IBLA 287. The IBLA held the State to have done what it could have done with its subrogation rights with re-

---

**2.** The elements of estoppel are: (1) The party to be estopped must know the facts; (2) He must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) The latter must be ignorant of the true facts; and (4) He must rely on the former's conduct to his injury. *United States v. Wharton,* 514 F.2d 406, 412 (9th Cir.1975).

spect to the 1800 acres. The State made no showing upon remand to the BLM that it acquired subrogation rights to any of the selection rights appurtenant to the 6,901.17 acres.

■ I also find the BLM has the authority to question the actions of the GLO. Such authority follows from the authority to audit all previous land transactions. It may also question the Oregon Supreme Court's classification of the base lands involved in the Hyde Fraud Combine, because it was not a party to the State's proceedings against Hyde. As a general rule, the government is not estopped to attack illegal transactions approved by its officers or agents, especially when public land is involved. *Utah Power & Light Co. v. United States*, 243 U.S. 389, 401, 37 S.Ct. 387, 388, 61 L.Ed. 791 (1917); *United States v. California*, 332 U.S. 19, 39–40, 67 S.Ct. 1658, 1668–1669, 91 L.Ed. 1889 (1947).

## THE CATEGORY II LANDS AND THE PRESENT RIGHT TO SELECT INDEMNITY LANDS UNDER THE INDEMNITY ACT OF 1891 (43 U.S.C. § 851)

■ The Category II lands consist of 2,662.42 acres for which Oregon has not received indemnity lands in exchange. Oregon now claims it is entitled to use these lands as base. It claims the IBLA erred in its decision that all rights to select have been lost because Oregon failed to pursue its rights under the Forest Lieu Act of 1897 and the subsequent legislation designed to compensate holders of rights after the repeal in 1905 of the Act.[3]

■ Oregon assigns as error the assumption of the BLM and the IBLA that its selection rights emanate solely from the Forest Lieu Act of 1897. It claims a right to select indemnity land under the Indemnity Act of 1891, R.S. 2275, now codified at

43 U.S.C. § 851 which states in relevant part:

Where settlements with a view to preemption or homestead have been, or shall hereafter be made, before the survey of the lands in the field, which are found to have been made on sections sixteen or thirty-six, those sections shall be subject to the claims of such settlers; and if such sections or either of them have been or shall be granted, reserved, or pledged for the use of schools or colleges in the State in which they lie, other lands of equal acreage are hereby appropriated and granted, and may be selected, in accordance with the provisions of section 852 of this title, by said State, in lieu of such as may thus taken by preemption or homestead settlers. And other lands of equal acreage are also hereby appropriated and granted and may be selected, in accordance with the provisions of section 852 of this title, by said State where sections sixteen or thirty-six are, *before title could pass to the State*, included within any Indian, military, or other reservation, or are, *before title could pass to the State*, otherwise disposed of by the United States. (Emphasis added).

The State relies on a 1917 decision of the United States Supreme Court which construed the language of the Indemnity Act of 1891, the precursor statute to 43 U.S.C. § 851. That decision, *California v. Deseret Water, etc. Co.*, 243 U.S. 415, 37 S.Ct. 394, 61 L.Ed. 821 (1917) allowed states to exchange school sections which had been enclosed in a military, Indian, or other reservation *after* title had vested in the State. The State claims the language of the 1891 Act is substantially the same as 43 U.S.C. § 851, so it is entitled to indemnity selections now under § 851.

I find Oregon is not entitled to select indemnity land under 43 U.S.C. § 851. The ILBA did not err when it assumed the State's present selection rights are limited

---

**3.** The record indicates the State did not seek to have its base land returned under the Act of 1922, 42 Stat. 1017 or under the Act of 1930, 46 Stat. 257, § 6; did not record its selection rights within two years under the Recordation Act of 1955, 69 Stat. 534, or apply for payment for its

base land under the Sisk Act of 1960, 74 Stat. 334. All these Acts attempted to compensate those who relinquished base lands to the United States, but received nothing in return because of the 1905 repeal.

to the Forest Lieu Act of 1897 and subsequent legislation. The language of 43 U.S.C. § 851 is substantially different from the language in the Indemnity Act of 1891, as construed in *Deseret*. Two amendments to the 1891 Act, one in 1958 and the other in 1960, give the State present selection rights only when the school lands were enclosed in a forest reservation *before* title could pass to the state.

The language of the 1891 Act allowed selections by states "where sections sixteen or thirty-six are mineral land, or are included within any Indian, military or other reservation, or are otherwise disposed of by the United States." Act of February 28, 1891, 26 Stat. 796. This is the language the Supreme Court construed in *Deseret* as allowing selections when title to school lands had already been acquired by the state.

In 1958, this same clause was amended to allow selections only "where sections sixteen or thirty-six are, *prior to survey*, included within any Indian, military, or other reservation." Act of August 27, 1958, 72 Stat. 928. The legislative history to this Act recognized that title to public lands cannot pass from the United States before they have been surveyed. 1958 U.S.Code Cong. & Adm.News. 3963, 3966–67, reprinting House Report No. 2347 and the letter of June 16, 1958 from the Secretary of the Interior. Thus, after 1958, the states could not employ lands as base unless title to them had never been received. The Category II lands here were deeded to Hyde in the early part of the century, so the title had vested in the State.

The 1960 Amendment, the Act of June 24, 1960, 80 Stat. 220, supports this construction of selection rights under 43 U.S.C. § 851. The words "prior to survey" were replaced by the phrase "before title could pass to the State." This language is conclusive that the Category II lands cannot now be used as base in selections under 43 U.S.C. § 851.

I specifically find no equitable title to these lands in the State, for reasons discussed previously. 1342.42 acres are Supplement A lands with title vested in the United States. Another 680 acres are Supplement B and C lands, but are subject to reclassification as A land because of the GLO's acceptance of master deeds. I need not decide whether the United States is an adverse possessor of these acres or 640 acres of land not considered in *State v. Hyde*, because I have decided the State has no present selection rights under either the Forest Lieu Act of 1897 or under 43 U.S.C. § 851.

## B. THE OREGON II DECISION: INDEMNITY SELECTIONS FOR FRACTIONAL TOWNSHIPS.

The Act of February 26, 1859, ch. 58, 11 Stat. 385, codified in substantial part as Revised Statute 2275, 2d ed. (1878), provided for appropriations "to compensate deficiences for school purposes, where sections sixteen or thirty-six are fractional in quantity, or where one or both are wanting by reason of the township being fractional, or from any natural cause whatever." This statute is presently codified at 43 U.S.C. § 851 (1976) and provides in relevant part that:

> [I]t shall be the duty of the Secretary of the Interior, without awaiting the extension of the public surveys, to ascertain and determine, by protraction or otherwise, the number of townships that will be included within such Indian, military, or other reservations, and thereupon the State shall be entitled to select indemnity lands to the extent of section for section in lieu of sections therein which have been or shall be granted, reserved, or pledged; but such selections may not be made within the boundaries of said reservation:, *Provided however,* That nothing in this section contained shall prevent any State from awaiting the extinguishment of any such military, Indian, or other reservation and the restoration of the lands therein embraced to the public domain and then taking the sections sixteen and thirty-six in place therein.

On May 10, 1984 the IBLA issued its second opinion, 80 IBLA 354, deciding Oregon's entitlement to indemnity lands when

new surveys or protractions over unsurveyed land revealed new fractional townships. The IBLA decided Oregon was entitled to indemnity land in either case.

However, the State now assigns as error the IBLA's conclusion that when a new fractional township is discovered as a result of protraction, the State must select indemnity lands as specified in 43 U.S.C. § 852(b). Section 852(b), called the pro rata rule, requires the State to select two sections when the township is greater than ¾ths of a regular township; 1.5 sections when the fractional township is ½ to ¾ths the size of regular township; one section when the fractional township is ¼ to ½ the size of a regular township; and ½ section when the fractional township is less than ¼ the size of a regular township.

The State contends it is entitled instead to the actual acreage contained in sections in place within a newly discovered fractional township, revealed by protraction. It maintains there need not be a survey, approved by the government, in order to be entitled to a selection based on the actual amount of acreage in the base section.

I find the IBLA correctly held the State must use the pro rata rule of 43 U.S.C. § 852(b) when selecting indemnity land for new fractional townships which have been delineated by protraction. The State is not entitled to an equal amount of indemnity acreage for any acreage estimate of a base section determined by protraction, because such estimate has no legal significance. 43 U.S.C. § 851 specifies a protraction is to be used only to determine the number of townships, not the amount of acreage in a section. The IBLA correctly observed:

> Under well-established principles, until a survey is run and approved, the designated sections of a township are undefined and the lands are unidentified. *United States v. Morrison, supra.* [240 U.S. 192, 36 S.Ct. 326, 60 L.Ed. 599 (1916)]. A survey of public lands does not ascertain boundaries; it creates them. *Cox v. Hart,* 260 U.S. 427, 436 [43 S.Ct. 154, 157, 67 L.Ed. 332] (1922). Absent a survey, any argument by the State calling for indemnity lands equal in acreage to a protracted school section must overcome these well-settled principles. 80 IBLA 367.

In summary, I find that the decisions of the IBLA of January 10, 1984 and May 10, 1984 were not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

IT IS ORDERED that the motion for summary judgment of the Department of the Interior, Bureau of Land Management is GRANTED. IT IS FURTHER ORDERED that the motion for summary judgment of the State of Oregon is DENIED.