**STATE OF OREGON, By and Through the DIVISION OF STATE LANDS, Plaintiff–Appellant,**

v.

**The BUREAU OF LAND MANAGEMENT, DEPARTMENT OF THE INTERIOR, UNITED STATES of America, Defendant–Appellee.**

No. 87–4096.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 31, 1988.

Decided June 7, 1989.

As Amended June 30 and July 31, 1989.

Robert W. Muir, Michael D. Reynolds, Dept. of Justice, State of Or., Salem, Or., for plaintiff-appellant.

Dirk D. Snel, Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for defendant-appellee.

James R. Parker, Jr., Kuhs & Parker, Bakersfield, Cal., for Amicus Curiae, California Land Title Ass'n, Oregon Land Title Ass'n and Washington Land Title Ass'n.

Before BROWNING, TANG and FARRIS, Circuit Judges.

TANG, Circuit Judge:

In 1968, the State of Oregon ("Oregon") made applications to the Bureau of Land Management ("BLM") to obtain federal land under 43 U.S.C. § 851. After audits of land transactions dating back to 1859, the BLM concluded that Oregon had already received public lands in excess of its entitlement and therefore denied Oregon's applications. The BLM also ruled that the "pro rata rule" of 43 U.S.C. § 852(b) must be utilized for indemnity selections in lieu of unsurveyed school sections in fractional townships. On administrative appeal, the Interior Board of Land Appeals ("IBLA")

affirmed the BLM. On judicial review, the district court granted summary judgment in favor of the BLM, ruling that the decisions of the IBLA were not arbitrary, capricious, an abuse of discretion, nor otherwise not in accordance with the law. *Oregon v. Bureau of Land Management*, 676 F.Supp. 1047 (D.Or.1987). Oregon appeals. We have jurisdiction under 28 U.S.C. § 1291.

## I. Background

In order to better understand this case, it is necessary first to review some pertinent statutes and historical facts.

### A. Oregon Admission Act

Oregon was admitted into the Union on February 14, 1859 under the Oregon Admission Act. 11 Stat. 383. Under this Act, the United States agreed to provide certain federal land to Oregon for support of its schools:

> That the following propositions be, and the same are hereby, offered to the said people of Oregon for their free acceptance or rejection, which, if accepted, shall be obligatory on the United States and upon the said State of Oregon, to wit: First, That sections numbered sixteen and thirty-six in every township of public lands in said State, and where either of said sections, or any part thereof, has been sold or otherwise been disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to said State for the use of schools.

11 Stat. 383 § 4.

In considering a similar provision in a case involving Wisconsin, the Supreme Court noted that "[i]t was ... an *unalterable condition* of the admission, obligatory upon the United States, that section sixteen (16) of every township of the public lands in the State, which had not been sold or otherwise disposed of, should be granted to the State for the use of schools." *Beecher v. Wetherby*, 95 U.S. (5 Otto) 517, 523, 24 L.Ed. 440 (1877) (emphasis added).

### B. The Indemnity Act of 1891 and 43 U.S.C. §§ 851–852

Problems arose when the sections designated for the states were unavailable. To deal with this problem, Congress enacted a line of statutes providing for selections of other public lands in lieu of the unavailable sections. *See United States v. Morrison*, 240 U.S. 192, 36 S.Ct. 326, 60 L.Ed. 599 (1916). The Indemnity Act of 1891, Rev. Stat. §§ 2275–76, was a key statute in this regard. After some consolidation and amendment, these statutes are now codified in 43 U.S.C. §§ 851–852. *See Andrus v. Utah*, 446 U.S. 500, 100 S.Ct. 1803, 64 L.Ed.2d 458 (1980).

### C. The Forest Lieu Act

The Forest Lieu Exchange Act of 1897 ("the Forest Lieu Act"), provided for indemnity selections when sections 16 and/or 36 were located within a national forest:

> That in cases in which a tract covered by an unperfected bona fide claim or by a patent is included within the limits of a public forest reservation, the settler or owner thereof may, if he desires to do so, relinquish the tract to the Government, and may select in lieu thereof a tract of vacant land open to settlement not exceeding in area the tract covered by his claim of patent.

30 Stat. 11, 36.

The Land Department of the General Land Office ("GLO"), the predecessor of the BLM, adopted rules and procedures for the administration of the Act. Specifically, a forest lieu applicant was to (1) prepare a quitclaim deed relinquishing base land to the United States, along with an affidavit of title to show the deeds were effective to pass title and that the lands were free of tax liens or other encumbrances; (2) file the deed and the abstract with the local land office; and (3) file with the deed and the abstract an application form for the selected lands. 24 L.D. 592–93. These rules have been declared "reasonable" by the Supreme Court. *Cosmos Exploration Co. v. Gray Eagle Oil Co.*, 190 U.S. 301, 309, 23 S.Ct. 692, 696, 47 L.Ed. 1064 (1903).

### D. The Hyde Fraud Combine

Between 1898 and 1902, Mr. F.A. Hyde and others conspired to obtain state school lands within the boundaries of national forests, and to exchange them for more valuable federal land, using the indemnity selection process of the Forest Lieu Act.[1]

The State of Oregon held title to these school lands (the "base" lands) within the national forests. Hyde arranged for applicants, some of whom may have been fictitious, to purchase the base lands from the State. Under Oregon law, Oregon citizens could purchase Oregon land, but were limited to 320 acres for personal use, not for speculation. Hill's Annotated Laws § 3618. Hyde, however, devised an elaborate scheme to avoid these limitations.

Hyde defrauded Oregon of about 47,000 acres of school lands which he acquired from Oregon at $1.25 per acre. Hyde sold selection rights at a considerable profit. *State v. Hyde*, 88 Or. 1, 32, 169 P. 757, 766 (1918). Prior to 1903, federal patents were issued to Hyde for approximately 27,000 acres of indemnity lands subsequently selected by Hyde under the Forest Lieu Act. Hyde persuaded employees of the GLO in Washington, D.C. to expedite Hyde applications for indemnity land in violation of a policy requiring them to be processed in the order received. *Id.*

When the Secretary of the Interior became aware of the fraud, he issued an order on November 21, 1902 suspending all applications for forest lieu selections bearing Hyde's name as the applicant or as the attorney for the applicant. Further orders in 1903 and 1904 suspended all applications for forest lieu selections involving Oregon school lands as base. The Department of Interior also sought to cancel all patents issued to Hyde for indemnity land, but a statute of limitations prevented cancellation, except for 1,680 acres.

On March 3, 1905, Congress repealed the Forest Lieu Act. A grandfather clause, however, permitted previously made selections to be perfected and patented, and reselections to be made if a pending selection were held invalid for any reason not the fault of the selector. 33 Stat. 1264. In 1908, Hyde was found guilty of criminal fraud against the United States, and his conviction was affirmed by the U.S. Supreme Court. *Hyde and Scheider v. United States*, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912).

### E. Oregon State Court Proceedings Against Hyde

In 1910, the United States commenced adverse proceedings against forest lieu selections made by Hyde. These proceedings were suspended in 1912 so that Oregon could proceed with its suits. In 1913, Oregon began legal proceedings in state court against Hyde to cancel Hyde's deeds to the state's school lands which Oregon had issued to Hyde. The land in question had not been exchanged for patents under the Forest Lieu Act. The suits involved 29,078.74 acres.

Final decisions of the Oregon Supreme Court were handed down in 1918 and were reported in six published decisions.[2] In these decisions, the Supreme Court of Oregon divided the lands into three categories: Supplement A, Supplement B, and Supplement C. These categories are important because they are referred to by the parties and in the decisions below:

*Supplement A:* 17,355.62 acres of land offered by Hyde as base to the U.S. under the Forest Lieu Act, whose accompanying applications were approved by the GLO, but which later were suspended by the Secretary's order of November 21, 1902. The selected lands were never patented.

*Supplement B:* 9,385.17 acres of land offered by Hyde as base to the U.S., but

---

**1.** In the briefs and in the decisions below, Hyde and his associates are referred to as the "Hyde Fraud Combine."

**2.** *State v. Hyde*, 88 Or. 1, 169 P. 757 (1918); *State v. Hyde*, 88 Or. 61, 169 P. 774 (1918); *State*

*v. Hyde*, 88 Or. 66, 169 P. 775 (1918); *State v. Hyde*, 88 Or. 73, 169 P. 777 (1918); *State v. Hyde*, 88 Or. 81, 169 P. 778 (1918); *State v. Hyde*, 88 Or. 81, 169 P. 779 (1918).

whose accompanying applications were never approved by the GLO.

*Supplement C:* 2,337.95 acres of land never even offered as base.

The Supreme Court of Oregon held that, because Supplement A lands had been offered as part of a selection application and were approved by the GLO, the deeds to the lands had been accepted by the United States, and therefore title had passed to the United States. Because title had passed to the United States, the United States was deemed to be a necessary party to any deed cancellation proceedings. Thus, because the United States refused to make an appearance as a party, the Supreme Court of Oregon dismissed the deed cancellation proceedings with respect to the Supplement A lands. The Supreme Court of Oregon, however, cancelled the deeds of the Supplement B and C lands.

### F. Federal Proceedings Against Hyde

Following these decisions of the Supreme Court of Oregon, the GLO resumed adverse proceedings against the Hyde selections. The State of Oregon filed answers alleging fraudulent procurement of title. In 1920, with the cooperation of the Department of the Interior, Oregon reached a compromise agreement with the transferees of selections whose base lands were within Supplement A. In consideration of $7.50 per acre from the transferees, Oregon agreed to issue quitclaim deeds to the United States in order to perfect title and allow the selections to proceed to patent. As a result of this compromise, the GLO halted its adverse proceedings relating to Supplement A lands, and Oregon quitclaimed 5,440 acres to the United States. Hyde quitclaimed to Oregon an additional 2,600 acres for which it was not able to complete its selections.

Other proceedings involving Supplement A lands were heard by the GLO in 1922. The GLO held that Oregon's failure to institute recovery proceedings in the five years since the decision of the Oregon Su-

preme Court made its claims subject to the defense of laches. Pending charges against various selections were dismissed, and thereafter the United States issued patents for 6,816.62 acres, accepting Supplement A lands as base.

In the meantime, the GLO cancelled forest lieu selections on lands included in Supplement B. This was done by notices informing selectors of the recent *Hyde* cases and stating the land offered in exchange was not the property of the selector, but rather of Oregon.

### G. The 1929–32 Land Exchanges

During the period 1929 through 1932, 1,800 acres of Supplement A lands were offered by Oregon as base in exchange for selected lands. Oregon had acquired quitclaim deeds for these base lands from Hyde. This exchange was approved by the GLO and was made pursuant to a Presidential Proclamation of April 28, 1927, 45 Stat. 2907, which carved out a block of land from the Siuslaw National Forest to provide lands for selection by Oregon in satisfaction for its right to indemnity for lost school lands.

The GLO approved Oregon's clearlists[3] and transferred title to Oregon to 68,666.1 acres of land pursuant to the April 28, 1927 Presidential Proclamation. In the exchanges, Oregon offered as base 11,385.17 acres of land which had been subject to the *State v. Hyde* cases plus 57,470.89 acres of land which were not the subject of the *Hyde* cases.

Thus, of the 11,185.17 acres at issue for which Oregon received land in exchange:

(a) 9,385.17 acres involved Supplement B and C base land from the *Hyde* cases for which the deeds had been cancelled by the Oregon Supreme Court;

(b) 1,800 acres were in exchange for Supplement A land for which the deeds had not been cancelled by the Oregon Supreme Court, but which Oregon had se-

---

**3.** "A clear list is a government list of lands, title to which has been cleared to a party. It transfers title as effectively as a patent." 676 F.Supp. at 1055; *see also United States v. Southern Pac. Transp. Co.,* 601 F.2d 1059, 1061–62 (9th Cir. 1979).

cured quitclaim deeds from Hyde or his successors.[4]

Note that these 11,185.17 acres were subsequently labeled "Category I" land.

An additional 2,662.42 acres at issue represent lands for which Oregon received no indemnity and which were not involved in the 1929–32 exchanges. These are called "Category II" land. Of the 2,662.42 Category II acres, 1,342.62 acres are Supplement A lands to which the deeds were not cancelled in the Oregon *State v. Hyde* cases, 680 acres were Supplement B and C lands, and 640 acres were not considered in the *State v. Hyde* cases.

### H. New Fractional Townships

Surveys of public lands are conducted under the authority and direction of the Secretary of the Interior. 43 U.S.C. §§ 2, 52. According to 43 U.S.C. § 751, public lands are to be surveyed to delineate "townships" of six miles square, subdivided into 36 "sections containing, as nearly as may be, six hundred and forty acres each." New government surveys and reprotractions have revealed the existence of new fractional townships in Oregon. Fractional townships arise when a township encloses less than the usual six square miles because of intervening lakes or waterways, irregular terrain features, Indian reservations, state boundaries, or other reasons. Sections within fractional townships are numbered as if the townships are complete. In the instant matter, the new townships do happen to contain a section 16, a section 36, or both.

### II. Procedural History

In 1968, Oregon made four applications to the BLM for school land selection. Specifically, the applications were for approximately 950 acres of indemnity selections, to which Oregon claimed entitlement under 43 U.S.C. § 851. In response to the applica-

tions, which are concededly valid, the BLM conducted an audit of all school land transactions which had taken place between Oregon and the federal government since Oregon became a state in 1859.[5] Based on this audit, on April 12, 1973, the BLM concluded that Oregon had already received public lands in excess of its entitlement and thus denied Oregon's applications. A revised audit in 1978 also concluded that Oregon was overdrawn on its indemnity selections. In other words, the audit results were used to offset Oregon's 1968 applications.[6]

Oregon appealed the BLM's decision to the IBLA. In a lengthy published decision, *State of Oregon I*, 78 I.B.L.A. 255, 91 I.D. 14 (January 10, 1984), the IBLA upheld the BLM's conclusion that Oregon had received public land in excess of its entitlement and was therefore not entitled to select any more land unless it could show that state deeds originally had been issued to fictitious persons in the Hyde transactions. Oregon was given an opportunity to make such a showing but was unable to do so. With regard to Category II lands, the IBLA also affirmed that Oregon had no selection rights. In a separate opinion, *State of Oregon II*, 80 I.B.L.A. 354, 91 I.D. 212 (May 10, 1984), the IBLA affirmed the use of the "pro-rata" rule of 43 U.S.C. § 852 with respect to the new fractional townships.

The district court found that these decisions of the IBLA "were not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and granted summary judgment in favor of the BLM. 676 F.Supp. at 1062. Oregon now appeals. The California Land Title Association, the Oregon Land Title Association, and the Washington Land Title Association have filed a joint Amicus Curiae brief in support of Oregon.

---

4. BLM no longer contests the treatment of these 1,800 acres as valid "base" in the exchanges.

5. Although this question is not squarely before us on appeal, we generally agree with the district court that the BLM had the authority to conduct the audit. "[A]n audit of all transactions is the only practical method by which the

BLM can determine whether the grant of land has been exceeded." 676 F.Supp. at 1053.

6. Oregon and BLM entered into an extensive Stipulation, which is operative at all levels of proceedings, including now before us.

## III. Standards of Review

A grant of summary judgment by the district court is reviewed de novo. *Nevada v. United States*, 731 F.2d 633, 635 (9th Cir.1984). The appellate court applies the same standard in reviewing a decision of an administrative agency as is employed by the district court. *Arizona Past and Future Found v. Lewis*, 722 F.2d 1423, 1425–26 (9th Cir.1983). Our review is thus governed by the Administrative Procedure Act which provides that "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ... [or] in excess of statutory authority." 5 U.S.C. § 706(2)(A, C). "[T]he scope of judicial review under this standard is narrow, and ... a reviewing court may not substitute its judgment for that of the agency." *Natural Resources Defense Council, Inc. v. Hodel*, 819 F.2d 927, 929 (9th Cir.1987). Indeed, under this standard "[a] fairly high risk of [agency] error must be tolerated." 2 C. Koch, *Administrative Law and Practice* § 9.6, p. 96 (1985).

On the other hand, while an agency's interpretation of its own regulations and of the statutes it administers is entitled to deference, *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), "the courts are the final authorities on issues of statutory or regulatory construction." *Natural Resources Defense Council, Inc.*, 819 F.2d at 929. "[I]t is black letter law that the courts are the final arbiters of questions of law and can substitute their judgment for that of the agency." 2 C. Koch, *Administrative Law and Practice* § 9.18, p. 49 (supp.1987). We must reject administrative constructions which are contrary to congressional intent. *Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984). Also, "[a] statutory construction to which an agency has not consistently adhered is owed no deference." *United Transp. Union v. Lewis*, 711 F.2d 233, 242 (D.C.Cir.1983) (citing *General Elec. Co. v. Gilbert*, 429 U.S. 125, 141–42, 97 S.Ct. 401,

410–11, 50 L.Ed.2d 343 (1976)). Furthermore, the existence of a prior administrative practice, even a well-explained one, does not relieve us of our responsibility to determine whether that practice is consistent with the agency's statutory authority. *SEC v. Sloan*, 436 U.S. 103, 118, 98 S.Ct. 1702, 1712, 56 L.Ed.2d 148 (1978).

## IV. The IBLA Finding That Oregon Had Received Public Land In Excess Of Its Entitlement And Therefore Was Not Entitled To Select Any More Land

Oregon's basic argument is that the IBLA erred in holding that the Supplement B and C lands offered by Oregon in the 1929–32 exchanges with the federal government were invalid as base because Oregon lacked title, the U.S. having previously acquired the title from the Hyde Fraud Combine. The BLM asserts that it does not intend to undo prior allegedly illegal transactions or to regain title to federal land previously lost. Rather, the BLM apparently seeks to make proper adjustments for these prior transactions by offsetting Oregon's past overdraws against Oregon's current indemnity claims.

### A. The IBLA Holding That Oregon Had The Burden Of Proving Whether Its Deeds Were Issued To Fictitious Persons.

With respect to the land in question in the 1929–32 exchanges, the IBLA ruled that Oregon did not have title, having previously transferred title to the Hyde Fraud Combine. The IBLA, however, held that to the extent that Oregon can show that the state deeds were issued to *fictitious individuals*, the state will be credited with ownership of the original base. 78 I.B.L.A. 255; 91 I.D. 14, 25. Indeed, there is a general rule of property law that a deed made out to a fictitious person is void, while a deed to a real person, even if obtained by fraud, is only voidable. *Moffat v. United States*, 112 U.S. 24, 31–32, 5 S.Ct. 10, 13–14, 28 L.Ed. 623 (1884).

Oregon claims that placing the burden of proof on the state on this issue constituted

a "presumption" in violation of Fed.R.Evid. 301 which wrongly relieved the BLM of its own burden of demonstrating one of the elements of its claim. According to Oregon, placing the burden of proof on the state was arbitrary and inequitable, especially considering that other courts have previously made findings or alluded to the fact that Hyde used fictitious names in order to acquire land fraudulently. *See Hyde v. United States*, 35 App.D.C. 451 (1910); *Hyde v. Shine*, 199 U.S. 62, 78, 25 S.Ct. 760, 762, 50 L.Ed. 90 (1905); *State v. Hyde*, 169 P. at 766, 88 Or. at 31.

It appears that the burden of proof was placed on Oregon because of the IBLA's factual conclusion that most of the transactions between Oregon and Hyde did *not* involve fictitious persons. Furthermore, the district court concluded that

> it was reasonable to instruct the State upon remand to show which individuals were fictitious. The State, through its historical records and access to county archives, is in the better position to determine which, if any, of the applicants were fictitious.

676 F.Supp. at 1056. In response, Oregon argues that there is no evidence tending to show that the state has access to such historical records.

"The decision as to which party must produce evidence at trial is basically a question of substantive policy. Usually the party who seeks redress must establish those factors at the heart of the claim that are considered vital if recovery is allowed." J. Friedenthal, M. Kane, & A. Miller, *Civil Procedure* 275 (1985). Given the property law policy of repose, particularly since it is the BLM who is challenging a line of title unquestioned since 1932, the burden of proof should be borne by the BLM rather than by Oregon.

Because the BLM seeks to prove the validity of the transactions between Hyde and the United States in order to support its audit of Oregon land claims, and because the BLM conducted the audit to prepare an affirmative defense against Oregon's concededly valid 1968 applications, the burden of fully proving this defense must be borne by the BLM. In ruling otherwise, the district court was in error. Nor do we find any evidence in the record that Oregon has unique access to historical records that should bear on this issue.

### B. The IBLA Holding That The United States Had Acquired Title To The Supplement B and C Lands From Hyde Prior To The 1929–32 Land Exchanges: The "Master Deed" Theory

■ Oregon argues that the IBLA erred in holding that, prior to the time Oregon used the lands as base in the 1929–32 land exchanges with the federal government, Hyde had previously conveyed title to the Supplement B and C lands to the United States. In considering the transactions between Hyde and the federal government under the Forest Lieu Act, the IBLA ruled that while the United States did not acquire title to Hyde's base land by the mere receipt of his Forest Lieu Act applications, the United States did obtain title to Hyde's land upon the federal government's acceptance of the deed relinquishing those base lands, even before Hyde received a patent of the selected lands.

The core of Oregon's argument is that if Hyde obtained any title from Oregon, it was only bare legal title and that the equitable title remained in the state because Hyde had obtained the state deeds by fraud. Oregon further argues that

> [t]here is no legal basis for concluding that the GLO had accepted title to the Supplement B and C lands, which had been offered by Hyde as base in "master deeds" describing multiple parcels, when the GLO issued patents for selected lands in exchange for some, but not all, of the parcels described in those master deeds. This theory of acceptance, which the BLM "cooked up" in the late stages of briefing the appeal to the IBLA, does not constitute positive evidence of acceptance of the master deeds.

*Appellant's Opening Brief* at 25.

The IBLA agreed with Oregon that Supplement B and C land, which by definition had not been accepted by the United States, never passed from Hyde to the

United States and therefore constituted valid base for Oregon in the 1929–32 exchanges. *State of Oregon I*, 78 I.B.L.A. at 293, 91 I.D. at 35–36. Based on the BLM audit, however, the IBLA ruled that the Oregon Supreme Court had misclassified some Supplement A land as Supplement B and C land.

Specifically, the IBLA found this land, misclassified as Supplement B and C land, was included in Hyde's "master deeds" containing other parcels. The district court noted that "[t]he Oregon Supreme Court apparently classified as [Supplement] A land only those base parcels in exchange for which selected land was patented, even if the deed contained additional base land." 676 F.Supp. at 1058. According to the BLM, the United States accepted these deeds and issued patents for lieu selections. The IBLA gave Oregon an opportunity to show that particular portions within the Hyde "master deeds" were not accepted by the GLO, but Oregon declined to do so.

The basic dispute between the parties on this issue, then, concerns the validity of this "master deed" theory. According to the IBLA:

> BLM argues that obviously GLO could not accept only part of a deed and, therefore, regardless of the fact that GLO never patented exchange lands which used the instant lands as base, GLO must have, in fact, "accepted" the deeds involving the lands at issue. Such an acceptance would, therefore, transfer such offered lands from Supplement B status to Supplement A status. There is compelling logic to BLM's assertions.

*State of Oregon I*, 78 I.B.L.A. 255, 293–94, 91 I.D. 14, 36 (1984).

In response, Oregon argues that "[i]f it is logical to infer that the GLO had accepted Hyde 'master deeds' because it had issued patents for some of the selected lands, it is just as logical to infer that it did not accept the 'master deeds' because it cancelled other selections based upon the same master deeds." *Appellant's Opening Brief* at 33. Indeed, Oregon's argument is persuasive.

Amici also demonstrate convincingly that the BLM's interpretation of the Forest Lieu Statute is anachronistic and inconsistent with contemporaneous interpretations by the GLO and the courts. While it is true that a patent to the lieu land could not issue until tender of the base and accompanying lieu selection had been approved by the GLO, complete titles to the base and to the lieu parcel were not exchanged until the patent was actually issued. *Roughton v. Knight*, 219 U.S. 537, 547, 31 S.Ct. 297, 299, 55 L.Ed. 326 (1911); *see also Lafayette Lewis*, 33 L.D. 43, 44 (1904) ("Lands conveyed to the United States under this act do not become public lands subject to entry until the title tendered has been accepted and approved."); *Mary Stanton*, 32 L.D. 260, 261 (1903) ("This was not an ordinary relinquishment, and it is not believed that it should be treated as such.... It was proffered conditionally and should have been so received, and held to await the action of the Department upon her application."); *United States v. McClure*, 174 F. 510, 511 (C.C. Or.1909) ("The mere execution and recording of a deed and the tender thereof vests no title in the government. Until the deed and title are examined and approved, it is a mere assertion by the applicant of his title and the right to make the selection.").

Oregon also points out that, according to numerous administrative and judicial decisions, Hyde's tender of deeds to the U.S. under the Forest Lieu Act was only a conditional offer of exchange which passed no title to the United States until the offer was accepted. Further, according to Oregon, since the GLO had never accepted Hyde's selection application using Supplement B lands as base, title to these lands did not vest in the United States. To support its position that the IBLA should be reversed, Oregon relies on *Udall v. Battle Mountain Co.*, 385 F.2d 90 (9th Cir.1967).

In *Battle Mountain*, we stated:

> Since the relinquishment to the United States contemplated a completed exchange of lands an equity in the nature of a right to rescission remained with the owner of the relinquished land until the exchange had been completed and it was not until then that the United States

might be regarded as vested with unconditional ownership.

385 F.2d at 94. In responding to *Battle Mountain,* the BLM concedes that deeds to base land held by the United States may only constitute "conditional ownership," but ownership nonetheless, subject to an outstanding right in the selector to seek rescission. The district court adopted this argument, holding that if the government did not uphold its part of the bargain, the applicant could simply sue for rescission or specific performance. 676 F.Supp. at 1057.

We construe the cited language from *Battle Mountain* as being congruent with the proposition, consistent with regular GLO practice, that the United States only held bare legal title to the base, with the applicant holding full equitable title until the selection was approved. There is no sound basis to conclude that forest lieu applicants' relinquishments of deeds were absolute surrenders of title or that they would have to assume the risk to sue the government either to rescind their relinquishment deeds or to issue patents to the lieu land. *See William E. Moses,* 33 L.D. 333, 334 (1904).

"To operate as an effectual transfer of title to land it is necessary that the deed should be delivered." 1 R. Devlin, *A Treatise on the Law of Deeds* § 260 at 283–284 (2d ed. 1897). "The delivery of a deed is essential to the transfer of the title. It is the final act, without which all other formalities are ineffectual." *Younge v. Guilbeau,* 70 U.S. (3 Wall.) 636, 641, 18 L.Ed. 262 (1865). *See also State v. Hyde,* 88 Or. at 13, 169 P. 757 ("It is elementary that in the absence of delivery the grantee in a deed acquires no rights thereunder."); *Lancaster v. May,* 194 Or. 647, 243 P.2d 268, 271 (1952) ("delivery is an indispensable requisite to the validity of a deed"). Furthermore, the specific wording of the deeds that Hyde executed to the United States indicates that the delivery to the United States was at least arguably conditional: "I *desire* to relinquish and reconvey

..." (emphasis added). *See Lancaster,* 243 P.2d at 271 ("To be effective, such delivery [of the deed] must be unconditional").

In conclusion, because the BLM's reinterpretation of the Forest Lieu statutes differs from contemporaneous interpretations and is inconsistent with the actions of the GLO, it is not entitled to deference on judicial review. *United Transp. Union v. Lewis,* 711 F.2d at 242. We thus reject the conclusions of the administrative agencies and of the district court, and we disapprove the "master deed" theory. In a forest lieu exchange, title vested only when a patent was actually issued on lieu land. A contrary rule would have created enforceable rights to unidentified portions of the public domain.[7]

## C. The IBLA Holding That Oregon Lacked Title to Category II Lands.

■ At issue is 2,662.42 acres of land for which Oregon received nothing in return. These 2,662.42 acres include Supplement A, B, and C land, plus 640 acres which were not the subject of the state *Hyde* suits. With respect to these Category II lands, the decision of the IBLA is somewhat complex. Specifically, regarding the Supplement A lands within Category II, the IBLA applied the same analysis as with the Supplement A lands within Category I, namely that title to these lands vested with the United States from the Hyde transactions.

Regarding the Supplement B and C lands within Category II, the IBLA ruled that the United States acquired title to such lands through adverse possession since it "openly and notoriously possessed the base lands ... far longer than would be required to vest the Federal Government's title under adverse possession, which in Oregon requires continuous possess for only 10 years." *State of Oregon I,* 78 I.B.L.A. at 297, 91 I.D. at 38.

Based on this reasoning, the IBLA concluded that

> [t]here is no statutory authority that would authorize BLM to permit an ex-

---

**7.** This is the "floating script" which the GLO disdained. *See Battle Mountain,* 385 F.2d at 92–94.

change of land where the offered base is already owned by the United States. Thus, regardless of whether this land properly be considered Supplement B and C or Supplement A land there is no possible way that BLM could recognize any selection rights in the State.

*Id.*

Regarding the remaining 640 acres, the IBLA found that the United States

issued a patent for 200 acres, using part of the tendered land as base. The patent was later cancelled. Insofar as that 200 acres of land is concerned, it is obvious that the United States accepted the deed. Therefore, this acreage is also properly classified as Supplement A, and [thus] ... no selection rights remain to be exercised. Insofar as the remaining 440 acres is concerned, we think it almost a certainty that GLO accepted the deed for all of the 640 acres, thus placing all of the land in Supplement A. But even were the State able to show that this land was properly considered Supplement B or C, the same considerations relating to adverse possession, just discussed, would compel the rejection of the State's argument concerning this acreage.

*State of Oregon I,* 78 I.B.L.A. at 298, 91 I.D. at 39.

The district court affirmed on the grounds that Oregon lost the right to indemnification when it failed to exchange under the Forest Lieu Statute and its successors, that Oregon possessed no indemnification rights under the Indemnity Act of 1891, despite the contrary rule of *California v. Deseret Water, Oil & Irrigation Co.,* 243 U.S. 415, 37 S.Ct. 394, 61 L.Ed. 821 (1917), and that Oregon lost title as well as indemnification rights under the master deed theory. 676 F.Supp. at 1060–61. The district court further concluded that the Supplement B and C lands are subject to reclassification as Supplement A land because of the GLO's acceptance of the "master deeds." *Id.* at 1061. Finally, the district court declined to rule on the IBLA's adverse possession theory since Oregon "has no present selection rights under either the Forest Lieu Act or under 43 U.S.C. § 851." *Id.*

One key issue in this regard, then, is whether Oregon's present selection rights are limited to the Forest Lieu Act and subsequent legislation. Oregon now contends that it has present selection rights under the Indemnity Act of 1891. To support its argument, Oregon refers to the *Deseret* case which construed the Indemnity Act so as to allow states to exchange school sections which had been enclosed in a military, Indian, or other reservation *after* title had vested in the State. After the *Deseret* opinion was handed down, the Indemnity Act of 1891 was twice revised, in 1958 and again in 1966, to arrive at its current form as codified in 43 U.S.C. § 851. The district court reviewed the legislative history of these post-*Deseret* amendments and concluded that *Deseret* is no longer good law. 676 F.Supp. at 1061.

The language of the 1891 Act allowed selections by states "where sections sixteen or thirty-six are mineral land or are included within any Indian, military or other reservation, or are otherwise disposed of by the United States." 26 Stat. 796. This is the language relied on by the Supreme Court in *Deseret* when they allowed selections when title to school lands had already been acquired by the state. In 1958, this same clause was amended to allow selections "where sections sixteen or thirty-six are, *prior to survey,* included within any Indian, military, or other reservation." 72 Stat. 928. In 1966, the statute was amended so that the phrase "prior to survey" was replaced by "before title could pass to the state." 80 Stat. 220.

We do not believe that the purpose of the amendments to the Indemnity Act was to restrict the holding of *Deseret. See, e.g.,* 1958 U.S.Code Cong. & Adm.News 3963; 1966 U.S.Code Cong. & Adm.News 2323. In affirming the decision of the IBLA, the district court's interpretation of the Indemnity Act of 1891 could have left states with title to isolated tracts in the midst of federal forests. There is no evidence that Congress intended such a result.

Furthermore, we decline to hold that Oregon lost title to its school grant lands. Because the district court relied on the "master deed" theory which we now reject, that can no longer be the basis for affirmance. Although the IBLA found that Oregon lost the title because of adverse possession, the district court did not consider this question. We thus remand these claims to the district court for initial determination.

### D. The BLM's Right to Use Previous Invalid Transactions as a Set–Off Against Current Applications

█ Oregon contends that the BLM cannot now use invalid transactions as a set-off against the state's entitlement to indemnity for school selections it never received. In response, the BLM argues that it still retains the power to make corrective adjustments for prior erroneous transactions. We agree with the BLM on this point. As discussed above, the BLM has the burden of proving that a transaction was erroneous before it may set-off.

Essentially, Oregon seeks to estop the federal government from considering the validity of prior transactions in calculating the state's remaining entitlement. In order to estop the government, affirmative misconduct must be shown, *United States v. Ruby Co.*, 588 F.2d 697, 703–04 (9th Cir. 1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979), in addition to the other elements of ordinary estoppel. *See United States v. Wharton*, 514 F.2d 406, 412 (9th Cir.1975). As the district court pointed out, the first of these elements of estoppel, that the party to be estopped must know the facts, is not met since "the GLO did not know the true status of the base land offered in these exchanges." 676 F.Supp. at 1059. Also, no affirmative misconduct by the federal government has been clearly shown. Furthermore, because of the "constitutional precept that federal public lands are held in trust by the federal government for all of the people," "policy considerations demand

that [equitable estoppel against the government] not be so applied without compelling reasons." *Ruby Co.*, 588 F.2d at 704.

On the other hand, we must emphasize that we are very respectful of long-established title to privately held lands. While the BLM may be entitled to a set-off against a state's present applications, our decision should in no way be construed as authorizing a reconsideration of the title to private lands or lands already conveyed to the state.

> Where questions arise which affect title to land it is of great importance to the public that when they are once decided they should no longer be considered doubtful. Such decisions become rules of property, and many titles may be injuriously affected by their change. Legislatures may alter or change their laws, without injury, as they affect the future only, but where courts vacillate and overrule their own decisions on the construction of statutes affecting title to real property, their decisions are retrospective and may affect titles purchased on the faith of their stability.

*Minnesota Mining Co. v. National Mining Co.*, 70 U.S. (3 Wall.) 332, 334, 18 L.Ed. 42 (1865).

### V. The IBLA Ruling That The "Pro Rata Rule" of 43 U.S.C. § 852(b) Must Be Utilized For Indemnity Selections In Unsurveyed School Sections In New Fractional Townships

After Oregon received its indemnity based on original federal government protractions,[8] new townships were recognized by a 1927 government survey and by the Government reprotractions of 1942 and 1966. The parties do not dispute the conclusion of the IBLA that Oregon may be entitled to indemnity for those school sections identified through these new federal surveys and reprotractions. The issue of contention is how the amount of indemnity land is to be calculated.

The starting point for the resolution of this dispute is the wording of the relevant

---

**8.** "A protraction is an extension of land of a cadastral survey for the purpose of describing unsurveyed land." *State of Oregon II*, 80 I.B.L.A. 354, 359, 91 I.D. 212, 216 (1984).

statutes. First, the initial proviso of 43 U.S.C. § 851 provides in relevant part that other lands of equal acreage are also hereby appropriated and granted and may be selected, in accordance with the provisions of section 852 of this title, by said State to compensate deficiencies for school purposes, *where sections sixteen or thirty-six are fractional in quantity, or where one or both are wanting by reason of the township being fractional,* or from any natural cause whatever. And it shall be the duty of the Secretary of the Interior, *without awaiting the extension of the public surveys,* to ascertain and determine, by protraction or otherwise, the number of townships that will be included within such Indian, military, or other reservations, and thereupon the State *shall be entitled to select indemnity lands to the extent of section for section* in lieu of sections therein which have been or shall be granted, reserved, or pledged; but such selections may not be made within the boundaries of said reservation. (emphasis added)

Second, the so-called "pro-rata" rule of 43 U.S.C. § 852(b) provides that:

[w]here the selections are to compensate for deficiencies of school lands in fractional townships, such selections shall be made in accordance with the following principles of adjustment, to wit: For each township, or fractional township, containing a greater quantity of land than three-quarters of an entire township, one section; for a fractional township, containing a greater quantity of land than one-half, and not more than three-quarters of a township, three-quarters of a section; for a fractional township, containing a greater quantity of land than one-quarter, and not more than one-half of a township, one-half section; and for a fractional township containing a greater quantity of land than one entire section, and not more than one-quarter of a township, one-quarter section of land: *Provided,* That the States which are, or shall be entitled to both the sixteenth and thirty-sixth sections in place, shall have the right to select double the amounts named, to compensate for defi-

ciencies of school land in fractional townships.

The IBLA ruled that when new fractional townships are discovered as a result of protraction, Oregon must select indemnity lands as per the "pro rata rule" of 43 U.S.C. § 852(b). The district court held that this conclusion was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 676 F.Supp. at 1062. In other words, according to the reasoning of the IBLA, which the district court affirmed, if a state is entitled to both the sixteenth and thirty-sixth sections, it may select two full sections of indemnity land if the fractional township is greater than three-fourths of a regular township; it may select one and one-half sections when the fractional township is one-half to three-fourths the size of a regular township; it may select one full section when the fractional township is one-fourth to one-half the size of a regular township; and it may select one-half of one section when the fractional township is less than one-fourth the size of a regular township.

Oregon disagrees with this reasoning, arguing that the pro rata rule applies only when the school sections themselves are either missing or incomplete, regardless of whether the township is surveyed or only protracted. Oregon believes that it is entitled, at its option, to indemnity land equal to the actual acreage of the base school section. The IBLA agreed with Oregon with respect to fractional townships that have actually been surveyed, but not when it has only been protracted. Although there is some authority giving special status to "surveys," *e.g., United States v. Morrison,* 240 U.S. 192, 199, 36 S.Ct. 326, 328, 60 L.Ed. 599 (1916) ("[p]rior to survey, ... designated sections were undefined and the lands were unidentified"); *Cox v. Hart,* 260 U.S. 427, 436, 43 S.Ct. 154, 157, 67 L.Ed. 332 (1922) ("[a] survey of public lands does not *ascertain* boundaries; it *creates* them"), there is also contrary authority. *See Rules and Regulations,* 24 I.D. 589, 593 (1897); 43 C.F.R. § 2621.1(d). Furthermore, 43 U.S.C. § 851 itself pro-

vides that the actuality of a survey is not determinative.

 Considering the plain language of Sections 851 and 852(b) in conjunction with each other, we must disagree with the IBLA and with the district court. Indeed, the phrase "deficiencies of school lands in fractional townships" in 43 U.S.C. § 852(b) is clarified by the italicized language we quote above from 43 U.S.C. § 851. In other words, a deficiency in school land exists only where the school section is itself fractional or missing from the fractional township. The pro-rata rule does not apply when the school section within a fractional township is whole. We reverse the district court on this issue.

### VI. Conclusions

With respect to Oregon's 1968 applications for school land selections, we remand the case to the district court for proceedings not inconsistent with this opinion. On remand, the district court shall determine the precise acreage to be allocated among the parties. Further, on remand the district court is to consider that "legislation of Congress designed to aid the common schools of the States is to be construed liberally rather than restrictively." *Wyoming v. United States*, 255 U.S. 489, 508, 41 S.Ct. 393, 399, 65 L.Ed. 742 (1921). With respect to the question of Oregon's selections in new fractional townships, we reverse the judgment of the district court and remand the matter for further proceedings not inconsistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.