958 F.2d 930
 NORTHWEST ENVIRONMENTAL DEFENSE CENTER, et al., Plaintiff-Appellant,
v.
James W. BRENNEN,* Assistant Administrator
for Fisheries, et al., Defendant-Appellee.
NORTHWEST ENVIRONMENTAL DEFENSE CENTER; Arthur Allen Burns,
et al., Plaintiffs-Appellants,
v.
James W. BRENNEN, Assistant Administrator for Fisheries;
National Marine Fisheries Service and Robert A.
Mosbacher,** Secretary
of Commerce, Defendants-Appellees,
and
State of Oregon, et al., Defendants-Intervenors.
 Nos. 88-4228, 89-35401.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 4, 1991.
Decided March 11, 1992.
 
 Linda K. Williams, Portland, Or., for plaintiffs-appellants.
 M. Alice Thurston, U.S. Dept. of Justice, Washington, D.C., for defendants-appellees.
 Appeal from the United States District Court for the District of Oregon.
 Before TANG, O'SCANNLAIN and RYMER, Circuit Judges.
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 We are asked to decide the validity of federal fishing regulations setting harvest limits for Oregon coastal coho salmon.
 
 
 2
 In these consolidated cases, appellants Northwest Environmental Defense Center, Oregon Trout, Inc., and Arthur Burns (collectively referred to as "NEDC") challenge regulations issued by the Secretary of Commerce. In both underlying cases, the district court granted summary judgment for the Secretary. Although NEDC attacks the regulations on several grounds, the major issue on appeal is whether the regulations allow overfishing in violation of the Magnuson Fishery Conservation and Management Act, 16 U.S.C. §§ 1801-1882 ("Magnuson Act"). We conclude that they do not, and affirm.
 
 
 3
 * The Magnuson Act, which governs federal management of fisheries, created eight Regional Fishery Management Councils. Each Council is responsible for creating and submitting to the Secretary of Commerce management plans for fisheries within its geographic area. 16 U.S.C. § 1852. The Pacific Fishery Management Council ("Pacific Council") prepares plans for the Pacific Ocean seaward of California, Oregon, Idaho, and Washington. Id. 1852(a)(6). The Pacific Council includes thirteen voting members: eight members appointed by the Secretary; the regional director of the National Marine Fisheries Service; and an official of each state within the region, designated by the Governor of that state. Id. §§ 1852(a)(6), 1852(b).
 
 
 4
 The Pacific Council submits each plan to the Secretary, who reviews it for consistency with the provisions of the Magnuson Act and other applicable law. Id. § 1854(a)(1). If the Secretary fails to disapprove a plan in whole or in part within ninety-five days, it takes effect as transmitted; no affirmative approval by the Secretary is required. Id. § 1854(b)(1). Once the plan takes effect, the Secretary must promulgate regulations implementing it. Id. § 1855(a).
 
 
 5
 In 1978, the Pacific Council prepared a management plan for ocean salmon fisheries, including commercial and recreational fisheries of chinook and coho salmon (the "salmon plan"). The Secretary approved the salmon plan, and published implementing regulations on April 14, 1978. The salmon plan was amended annually from 1979 to 1983 by actions of the Pacific Council with the approval of the Secretary. Because the amendment process proved cumbersome, the Council in 1984 adopted a Framework Amendment designed to prescribe the limits within which annual changes would be made and provide streamlined procedures for annual adjustments to, among other things, ocean harvest levels.
 
 
 6
 Coho salmon, like other anadromous fish, hatch in fresh water, migrate to the ocean to mature, and then return as adults to spawn and die in the stream or tributary in which they were hatched. Most coho return to spawn three years after hatching, although a certain number of precocious males spawn as two-year-olds. Because of their specialized spawning habits, populations (or stocks) of coho tend to remain geographically and temporally, and hence reproductively, isolated from one another. The Pacific Council manages all Oregon coastal naturally-spawning ("OCN") coho stocks as a single unit. The Council refers to the distinct temporal groups of OCN coho as cycles. The group that spawned in 1983, 1986, and 1989 is known as "Cycle 2." See 50 C.F.R. Pt 661, App. at IV (1986). Because of adverse climatic conditions, only 57,000 OCN coho returned to spawn in 1983. 51 Fed.Reg. 16,522 (1986). This 1983 crash in the Cycle 2 spawning population eventually gave rise to the current dispute between NEDC and the Secretary.
 
 
 7
 NEDC objects to the OCN coho escapement levels proposed by the Pacific Council and implemented by the Secretary for 1986 and subsequent years. With the approval of the Secretary, the Council sets annual escapement goals for OCN coho, designating the number of fish which should be allowed to escape ocean harvest to spawn. The Framework Amendment established an eventual escapement goal of 200,000 OCN coho, to be attained under a gradual rebuilding schedule. See 50 C.F.R. Pt. 661, App. at IV (1986). Escapement for Cycle 2 fish was set at 170,000 for 1986 and 200,000 for 1989. On May 5, 1986, the Secretary published in the Federal Register the final fishery management regulations for Pacific salmon for 1986 ("1986 Regulations"). 51 Fed.Reg. 16,520-26 (1986). The ocean harvest quotas for coho in the 1986 Regulations were expected to result in spawning escapement of 142,800 OCN coho, less than the 170,000 prescribed by the Framework Amendment.[1] Id. at 16,522.
 
 
 8
 NEDC filed an action challenging the 1986 Regulations on June 4, 1986. NEDC asserted that, in promulgating the 1986 Regulations, the Secretary had amended the salmon plan without observing required procedures. NEDC also contended that the Regulations violated the Magnuson Act, the National Environmental Policy Act, 42 U.S.C. §§ 4321-4347 ("NEPA"), and the Coastal Zone Management Act, 16 U.S.C. §§ 1451-1464 ("CZMA"). Further, NEDC alleged that the composition of the Pacific Council violated the Appointments Clause (art. II, § 2, cl. 2) of the United States Constitution. The State of Oregon intervened as a defendant in this action.
 
 
 9
 On February 10, 1987, before the 1986 suit was resolved, the Secretary approved an amendment to the salmon plan (the "1987 Amendment"). The 1987 Amendment introduced an "abundance-dependent" method for setting annual escapement goals for OCN coho. Abundance-dependent escapement goals vary with the estimated stock size for the year. The 1987 Amendment established a minimum escapement goal of 135,000 fish for stock sizes under 270,000; a goal of one-half the stock for stock sizes between 270,000 and 400,000 fish; and a goal of 200,000 for stock sizes exceeding 400,000 fish. 52 Fed.Reg. 4,150 (Feb. 10, 1987) (codified at 50 C.F.R. Pt. 661, app. at IV, n. 4 (1990)).
 
 
 10
 NEDC filed a second suit, challenging the 1987 Amendment, on March 6, 1987. This suit raised many of the same claims asserted in the earlier action. The district court entered summary judgment in favor of defendants in this second action on August 13, 1988.
 
 
 11
 Meanwhile, the district court had dismissed the 1986 action as moot following the end of the 1986 salmon fishing season. This court reversed and remanded. Northwest Envtl. Defense Center v. Gordon, 849 F.2d 1241 (9th Cir.1988). On remand, the parties agreed that the district court's resolution of the 1987 case controlled all claims except the CZMA claim. The district court granted summary judgment for the Secretary on this issue. NEDC timely appealed from both adverse judgments.
 
 II
 
 12
 As a preliminary matter, we conclude that the 1986 case was filed in the district court within the applicable limitations period. The Magnuson Act provides for judicial review of regulations "if a petition for such review is filed within 30 days after the date on which the regulations are promulgated." 16 U.S.C. § 1855(b)(1). The Secretary contends that the 1986 case is time-barred because it was filed on June 4, 1986, thirty-four days after the regulations at issue were filed with the Federal Register. NEDC responds that the regulations were not promulgated until they were published, on May 5. We agree.
 
 
 13
 As NEDC points out, the ordinary meaning of the word "promulgate" is "to publish" or "to announce officially." Black's Law Dictionary (abridged 5th ed. 1983) 634; see also Webster's Ninth New Collegiate Dictionary (1986) 942 ("to make known by open declaration"). The Secretary relies on American Petroleum Institute v. Costle, 609 F.2d 20, 22-24 (D.C.Cir.1979), in which the District of Columbia Circuit held that "promulgation" referred to filing with the Federal Register. American Petroleum, however, construed the term in an entirely different context than that presented here. In American Petroleum, the court determined that an agency, in defending a rule, could not rely on information added to the public record after it transmitted the rule in final form to the Federal Register. The logic of American Petroleum does not extend to statutory provisions setting the limitations period for challenges to administrative actions. The public generally does not know of such actions, and thus cannot be expected to begin preparing an attack on them, prior to publication.
 
 
 14
 Moreover, the fishery management regulations, as "statement[s] of general or particular applicability and future effect designed to implement, interpret, or prescribe law," fall within the APA's definition of rules. 5 U.S.C. § 551(4). As such, they must be published in the Federal Register. See id. § 553. The Secretary does not allege that NEDC had actual notice of the 1986 Regulations before the publication date. Absent such notice, NEDC "may not in any manner be required to resort to, or be adversely affected by" the Regulations prior to the date of publication. 5 U.S.C. § 552(a)(1). The limitations period did not begin to run on NEDC's challenge to the notice until May 5 and thus the 1986 case was timely filed.
 
 III
 
 15
 We next proceed to the merits of both the 1986 and 1987 suits. NEDC's primary contention is that the challenged regulations, because they rely on an abundance-dependent method of computing escapement goals, violate the Magnuson Act. We must uphold the Secretary's regulations unless they are arbitrary and capricious. See 16 U.S.C. § 1855(b)(1); 5 U.S.C. § 706(2)(A); Alaska Factory Trawler Ass'n v. Baldridge, 831 F.2d 1456, 1460 (9th Cir.1987).
 
 
 16
 The Magnuson Act sets out seven National Standards for fishery conservation and management. 16 U.S.C. § 1851(a). The Secretary must disapprove a fishery management plan unless it complies with these standards. Id. § 1854(b)(2). NEDC contends that the 1986 Regulations and the 1987 Amendment are inconsistent with National Standards 1 and 2, which state:
 
 
 17
 (1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.
 
 
 18
 (2) Conservation and management measures shall be based upon the best scientific information available.
 
 
 19
 16 U.S.C. § 1851(a).
 
 
 20
 * The Magnuson Act does not define "overfishing." NEDC contends that overfishing means any fishing which depletes stocks, even if it does not threaten extinction or irreversible damage. Thus, according to NEDC, overfishing "means all fishing which exceeds" maximum sustainable yield.[2] In response, the Secretary points to the definition of overfishing established by regulation:
 
 
 21
 Overfishing is a level or rate of fishing mortality that jeopardizes the long-term capacity of a stock or stock complex to produce [maximum sustainable yield] on a continuing basis.
 
 
 22
 50 C.F.R. § 602.11(c)(1) (1990).
 
 
 23
 The Magnuson Act contemplates maximum utilization of fishery resources consistent with the long-term health of the fishery. The National Standards prescribe achievement of "optimum yield" on a continuing basis. 16 U.S.C. § 1851(a)(1). Optimum yield is the amount of fish "which will provide the greatest overall benefit to the Nation, with particular reference to food production and recreational opportunities"; it is calculated "on the basis of the maximum sustainable yield ... as modified by any relevant economic, social, or ecological factor." 16 U.S.C. § 1802(21).
 
 
 24
 The statute provides the Secretary broad discretion to define optimum yield and overfishing. Harvest levels above maximum sustainable yield do not necessarily constitute overfishing within the meaning of National Standard 1.[3]
 
 
 25
 We conclude that the Secretary's definition is both reasonable and consistent with the plain language of the Magnuson Act. This court must therefore defer to the Secretary's interpretation. See Chevron, U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984); Washington Crab Producers v. Mosbacher, 924 F.2d 1438, 1447-48 (9th Cir.1991); Oregon v. Bureau of Land Management, 876 F.2d 1419, 1425 (9th Cir.1989).
 
 
 26
 Accepting the Secretary's definition of the term, the challenged regulations do not allow "overfishing." NEDC has not produced any evidence that abundance-dependent escapement goals are inconsistent with the long-term ability of the OCN coho stocks to attain maximum sustainable yield. Both sides agree that spawning escapement of 200,000 OCN coho represents the maximum sustainable yield. The abundance-dependent method allows a harvest in excess of maximum sustainable yield whenever the run dips below 400,000 fish. The Secretary has set an escapement floor of 135,000, however, so that if the run falls to or below this number no harvest is allowed. The floor escapement level was established after review of the past history of the stock, stock recruitment analysis, and review of the expected geographic distribution of spawners. It includes a built-in margin of safety and conservatism. NEDC has not pointed to any evidence in the record demonstrating that a spawning escapement of 135,000, whether in one year or in several, is inconsistent with the long-term health of the OCN coho stock.
 
 
 27
 NEDC's argument that a coho stock that suffers low escapement one year will continue to be depressed in future cycles has surface plausibility, but is not borne out by the record evidence. The record low escapement of 57,000 in the El Nino year of 1983 produced an estimated stock abundance of 286,000 in 1986. In fact the administrative record demonstrates that "[n]o recorded spawning escapement between 135,000 and 57,000 has ever produced a diminishing return." Because NEDC has provided no evidence to the contrary, we conclude that the Secretary's determination that the 1986 Regulations and 1987 Amendment are consistent with National Standard 1 was not arbitrary and capricious.
 
 B
 
 28
 NEDC also contends that the abundance-dependent method of calculating escapement goals violates National Standard 2, because it is not based on the best available scientific information. The Secretary admits that socio-economic, as well as biological, factors were considered in setting the abundance-dependent escapement goals, but maintains that the Magnuson Act requires consideration of such factors. The Act's definition of "optimum yield" as maximum sustainable yield "as modified by any relevant economic, social, or ecological factor" and as the harvest that "will provide the greatest overall benefit to the Nation" supports the Secretary's interpretation. 16 U.S.C. § 1802(21). Furthermore, NEDC has not pointed to any scientific evidence inconsistent with the Secretary's decision to use abundance-dependent escapement goals.[4] The Secretary did not act arbitrarily or capriciously in determining that the abundance-dependent method was consistent with National Standard 2.
 
 IV
 
 29
 NEDC contends that NEPA required the Secretary to prepare an environmental impact statement ("EIS") for the 1987 Amendment. We uphold an agency's decision not to prepare an EIS if that decision is reasonable. Sierra Club v. United States Forest Serv., 843 F.2d 1190, 1192 (9th Cir.1988).[5] In judging reasonableness, we may not substitute our judgment for that of the agency if the decision was fully informed and well considered. Id.
 
 
 30
 The Secretary prepared an Environmental Assessment ("EA") for the 1987 Amendment. The EA concluded that an escapement floor of 135,000 "will not jeopardize the productive capability of the natural coho stocks." Further, the EA noted that "ocean environmental conditions are improving" and thus that the 1987 Amendment probably will not result in escapement below the Framework Amendment's rebuilding schedule for a prolonged period. The Secretary also relied on data indicating that low escapement levels in one year typically have not produced a depressed stock size three years later.
 
 
 31
 Although NEDC takes issue with the Secretary's conclusions, it points to no evidence undermining their soundness. We conclude that the Secretary's decision not to prepare an EIS for the 1987 Amendment was reasonable.
 
 V
 
 32
 When the 1986 Regulations and the 1987 Amendment were promulgated, the CZMA mandated that "[e]ach Federal agency conducting or supporting activities directly affecting the coastal zone shall conduct or support those activities in a manner which is, to the maximum extent practicable, consistent with approved state management programs." 16 U.S.C. § 1456(c)(1).[6] The Secretary approved the Oregon Coastal Management Program on May 6, 1977. Regulations implementing the CZMA require federal agencies to "provide State agencies with consistency determinations for all Federal activities directly affecting the coastal zone." 15 C.F.R. § 930.34(a) (1991). Consistency determinations may take any form chosen by the federal agency, id., but should be transmitted at least ninety days before final approval of the proposed action. Id. § 930.34(b).
 
 
 33
 NEDC apparently contends that the Secretary violated the CZMA both by failing to issue a consistency determination with respect to the 1986 Regulations, and by modifying escapement goals in a manner inconsistent with the approved state program. NEDC's substantive claim of inconsistency with the state program is without merit. The Oregon Department of Fish and Wildlife reduced the state OCN escapement goal for 1986 to 142,800 prior to promulgation of the 1986 Regulations. The officials charged with enforcement of the Oregon program informed the Secretary that the 1986 quotas were consistent with Oregon law. The Secretary was entitled to rely on this state determination of consistency. Save Lake Washington v. Frank, 641 F.2d 1330, 1337-39 (9th Cir.1981).
 
 
 34
 NEDC's procedural claim need not be addressed, as no injury resulted from any procedural violation that might have occurred. The 1986 Regulations have been superseded by the 1987 Amendment, for which a full consistency determination was prepared. As previously noted, the state considered the escapement goal set by the 1986 Regulations consistent with the approved state program. Therefore, even if the Secretary failed to comply with the procedural requirements of the CZMA, a question we do not decide, that failure resulted in no injury to NEDC.
 
 VI
 
 35
 Finally, NEDC contends that the composition of the Pacific Council violates the Appointments Clause and the principle of separation of powers.[7] According to NEDC, the Council cannot constitutionally include members appointed by state governors, or make decisions affecting foreign relations.
 
 
 36
 NEDC lacks standing to raise these claims. Whatever constitutional infirmity may inhere in the Council's structure has not caused the injury of which NEDC complains. Nor would a declaration that the Council's composition violates the Constitution redress that injury. Although the Council proposed the challenged fishery regulations, those regulations were implemented by the Secretary after review. NEDC does not allege that plans proposed by a Council that did not include state-appointed members would provide for higher spawning escapement levels of OCN coho. Similar analysis applies to NEDC's contention that the Council unconstitutionally exercises authority over foreign affairs; NEDC does not allege that any such authority has affected salmon escapement goals or harvest levels.
 
 
 37
 In sum, NEDC's injury cannot be fairly traced to the alleged constitutional infirmities of the Council, and the relief sought on the constitutional claims would not redress that injury. Accordingly, NEDC lacks standing to assert its constitutional claims. See Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 74, 98 S.Ct. 2620, 2630-31, 57 L.Ed.2d 595 (1978); Warth v. Seldin, 422 U.S. 490, 505, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (1975); cf. Committee for Monetary Reform v. Board of Governors, 766 F.2d 538 (D.C.Cir.1985) (private individuals and businesses who allegedly suffered financial harm as a result of the policies of the Federal Reserve System lack standing to challenge the constitutionality of the composition of the Federal Open Market Committee).
 
 VII
 
 38
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 *
 James W. Brennen has been substituted for William E. Evans pursuant to Federal Rule of Appellate Procedure 43(c)(1)
 
 
 **
 Robert A. Mosbacher has been substituted for C. William Verity pursuant to Federal Rule of Appellate Procedure 43(c)(1)
 
 
 [1]
 The Secretary set ocean harvest quotas at a level exceeding that necessary to meet the OCN escapement goal in order to maximize the harvest of abundant hatchery stocks. 51 Fed.Reg. 16,522 (1986)
 
 
 [2]
 Maximum sustainable yield has been defined by the agency as "the largest average annual catch or yield that can be taken over a significant period of time from each stock under prevailing ecological and environmental conditions." 50 C.F.R. § 602.11(d)(1) (1990)
 
 
 [3]
 The language of the statute is unambiguous and vests broad discretion in the Secretary. Although we need not resort to legislative history, NEDC cites the Senate Report, which stated that maximum yield was to be the basic source of reference and that, although harvest above maximum yield "might be defensible, this would seem rare and should be only temporary." S.Rep. 416, 94th Cong., 1st Sess. 21 (1975). NEDC interprets this statement as a limitation on the Secretary's discretion to allow harvests exceeding maximum sustainable yield. On the other hand, the House Report explained that:
 [t]he concept of optimum sustained yield is, however, broader than the consideration of the fish stocks and takes into account the economic well-being of the commercial fishermen, the interests of recreational fishermen, and the welfare of the nation and its consumers. The optimum sustainable yield of any given fishery or region will be a carefully defined deviation from [maximum sustainable yield] in order to respond to the unique problems of that fishery or region.
 H.R.Rep. 445, 94th Cong., 1st Sess. 48 (1975), reprinted in 1976 U.S.C.C.A.N. at 615-616.
 Neither the House nor the Senate bill became the Magnuson Act. Instead, the conference committee combined elements of both bills. The Conference Report described the concepts of optimum yield and maximum sustainable yield in the final conference bill as unchanged from both earlier bills, except for technical and clarifying modifications. S.Conf.Rep. 711, 94th Cong., 2d Sess. 50 (1976) (reprinted in 1976 U.S.C.C.A.N. 674).
 Even if it were relevant, nothing in the legislative history conflicts with the Secretary's definition of overfishing.
 
 
 [4]
 NEDC also appears to argue that, in promulgating the 1986 Regulations, the Secretary failed to comply with the Framework Amendment, which allows modification of escapement goals only if:
 A comprehensive technical review of the best scientific information available provides conclusive evidence which, in the view of the Salmon Technical Team and the Council, justifies modification of an escapement goal.
 
 
 [50]
 C.F.R. § 661.22 (1990). We need not reach this claim, which is moot in light of the fact that the 1986 Regulations have expired and actual 1986 escapement appears to have exceeded the level prescribed by the Framework Amendment
 
 
 [5]
 In Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 375-76, 109 S.Ct. 1851, 1860-61, 104 L.Ed.2d 377 (1989), the Supreme Court applied an arbitrary and capricious standard of review to an agency decision not to file a supplemental EIS in response to new information. We need not decide whether this standard applies to the Secretary's decision not to prepare an EIS for the 1987 Amendment, because we see no basis upon which to fault the Secretary's determination under the less deferential "reasonableness" test
 
 
 [6]
 This provision was amended in 1990 to remove the requirement that the activity "directly affect[ ]" the coastal zone
 
 
 [7]
 Recent decisions of the Supreme Court and this court may reflect increased judicial attention to these concerns. See Freytag v. Commissioner, --- U.S. ----, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991); Silver v. United States Postal Serv., 951 F.2d 1033, 1042-46 (9th Cir.1991) (O'Scannlain, J., dissenting)